NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

WALLACE ATHILL,

       Plaintiff,                     Civil Action No. 06-4941(SDW)

       v.

JERRY SPEZIALE,              **OPINION**
ET AL.,

       Defendants.           June 30, 2009

**WIGENTON, District Judge**

Before the Court is a Motion for Summary Judgment (the "Motion") filed pursuant to Federal Rule of Civil Procedure 56 by Passaic County Sheriff Jerry Speziale ("Speziale"), Passaic County Jail Deputy Warden Brian Bendl ("Bendl"), an Unknown Sergeant, and Special Operations Response Team ("S.O.R.T.") Officers, (collectively, "Defendants").  The Motion seeks to dismiss Wallace Athill's ("Plaintiff") 42 U.S.C. § 1983 claims, which assert that Plaintiff's constitutional rights were violated as a result of a raid conducted at the Passaic County Jail.  For the following reasons, the Motion is granted in part and denied in part.

## I.      Jurisdiction and Venue

This Court has jurisdiction over Plaintiff's case based on 42 U.S.C. § 1983 and 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(b).

## II.      Factual Background

### A.      Plaintiff's Verified Complaint

"[A] complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint, [pursuant to] 28 U.S.C. § 1746."  *Roberson v. Hayti Police*

*Dep't*, 241 F.3d 992, 994-95 (8th Cir. 2001); *see also Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) ("In the case at bar, [*pro se* prisoner plaintiff] signed a form complaint containing the typewritten statement, 'I declare under penalty of perjury that the foregoing is true and correct.'  Thus, [*pro se* prisoner plaintiff's] complaint in this action was verified within the language of 28 U.S.C. § 1746.").

For purposes of Federal Rule of Civil Procedure 56, a verified complaint is treated as an affidavit in opposition to a summary judgment motion.  *See Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985); *see also Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist . . . .").

In this case, on November 2, 2006, Plaintiff filed a complaint[1] (the "Complaint") and "declare[d] under penalty of perjury that the foregoing is true and correct."  Compl. 7.  As such, the Complaint is treated as a verified complaint and the "statement of claim is transformed from 'mere allegations' of a pleading into 'specific facts' as in an evidentiary affidavit."  *McNeal v. Macht*, 763 F. Supp. 1458, 1461 (E.D. Wis. 1991) (citing *Reese*, 760 F.2d at 67 n.3).

The following facts are set forth on page 6 of the Complaint:

> On July 25, 2006 between 2:30 pm – 3[:00] pm at P.C. Jail on 4th fl. dorm 4–G–1, I was sitting on bench, playing cards, when about 10 to 30 sheriff officer's, came rushing in the dorm shouting, demanding everyone on your bunk, face down with your finger entwined, behind your head, or you will be fired upon.  I did so before the S.O.R.T. team's along with the "Sheriff" holding a gun, pointed in all directions, came into the dorm, on their way into dorm I was shot with one of those gun's, in my lower left side of my back, there was much pain, I felt from that, being shot, they then continued pass me, and went to the back of the dorm, and pulled two people out of the dorm, beating on them, before

---

[1] This Court received the Complaint on October 16, 2006.  Thereafter, on October 31, 2006, this Court granted Plaintiff's application to proceed *in forma pauperis* and directed the Clerk to file the Complaint, which was filed on November 2, 2006.

they came back to me and pulled me out also, then handcuffed me took me by weight gym door, where an Sargeant began questioning me about being a tough guy, I tried to turn to answer his questioning, but he grabbed the back of my head, and slammed it into "the wall," and telling me not to look at him, so I could not identify him, then he told me to get on my knee's and when I started to do so, he kicked my legs from under me, causing me to fall down on my chest, and face, then another officer put his knee on my back, for about 5 minutes causing more pain, then I was picked up and placed on elevator, and taken to first floor, bullpen #3 with other inmate's, who had been shot, beaten, or maced, I stayed in bullpen for about three hours, and then taken back to my dorm in my boxer underwear only, with female officer's present with nothing on my feet, when I began to look for my personal property in dorm, my legal paper's not found, my pictures, and mail, I put in ombudsman slips, no response, (I.A.) Internal Affairs, or to anyone whom could help rectify this situation.

Compl. 6.

## B.    Defendants' Submissions

Where a nonmoving *pro se* litigant fails to file a responsive Local Civil Rule 56.1 statement of undisputed material facts, a court may draw the relevant facts underlying the claims from available sources such as the complaint, deposition testimony, the moving litigant's Local Civil Rule 56.1 statement of undisputed material facts and supporting exhibits. *Jordan v. Allgroup Wheaton*, 218 F. Supp. 2d 643, 646 n.2 (D.N.J. 2002), *aff'd* 95 F. App'x 462 (3d Cir. 2004); *see also Folsom v. Superior Court of N.J.*, 2008 U.S. Dist. LEXIS 31994, 2008 WL 1782236, *5 (D.N.J. Apr. 17, 2008) (Where a nonmoving *pro se* litigant fails to file a responsive Local Civil Rule 56.1 statement, a court may examine the nonmoving *pro se* litigant's written submissions instead.).  However, if the nonmoving *pro se* litigant provides a written submission, which contains facts that contradict facts in the Rule 56.1 statement, the contradicted facts are deemed denied by the nonmoving *pro se* litigant.  *Folsom*, 2008 U.S. Dist. LEXIS 31994, at *14 (citing *Longoria v. N.J.*, 168 F. Supp. 2d 308, 312 n.1 (D.N.J. 2001)).

3

In support of the Motion, Defendants provide a Statement of Material Uncontested Facts

pursuant to Rule 56.1.  The Statement contains the following facts, which do not contradict the

facts presented in the Complaint:

> Plaintiff filed a complaint against Sheriff Jerry Speziale,
> Brian Bendl and numerous unknown officers alleging the use of
> excessive force.
> On July 25, 2006, Plaintiff was in the fourth floor of the
> dorm located at 4G1 when officers entered during a shakedown of
> the dorm.  Plaintiff indicates that he was shot in the back with a
> mace type gun during the shakedown.  The records of the Passaic
> County Jail indicate that on the indicated date there were
> numerous shakedowns of dorms following fighting and other
> disturbances in the Jail.  There is no report detailing a shakedown
> in 4G1 specifically.  Some individuals were removed from the
> dorm along with the Plaintiff.  Plaintiff then indicates that once
> outside the dorm an unknown officer slammed his head against
> the wall and kicked his legs out from under him.  Plaintiff alleges
> injuries resulting from the incident specifically to his back.
> Plaintiff has not supplied any medical expert regarding his
> injuries.

Defs.' Br. Summ. J. 1.  Plaintiff has failed to provide a responsive Rule 56.1 statement.

Defendants provided medical reports from the Passaic County Jail from March 2006

through January 2007.  Defs.' Br. Summ. J. Ex. C.  They are largely illegible.  In the medical

report dated July 26, 2006, the examiner noted a "circular lesion/abrasion" on Plaintiff's back

and noted Plaintiff complained of "pain to back area."  *Id.* at 6.  In the medical report dated

November 14, 2006, the examiner noted that the lower back pain complained of in July 2006

"started after he was shot by a pepper gun."  *Id.* at 8.

Defendants also provided nine Passaic County Sheriff's Department Bureau of

Corrections Incident Reports.  Defs.' Br. Summ. J. Ex. D.  Four of these reports contain details

of a raid in dorm 4G4 that occurred on July 25, 2006 at 4:30 P.M.  *Id.* at 1-3, 8.  According to

three of the reports, all inmates in the dorm were instructed to place their hands on their heads

and walk towards the dorm exit. *Id.* at 1-3. As an inmate was escorted towards the dorm exit, he took his hands off his head, swore at the officers and then kicked an officer in the abdomen. *Id.* Other officers took the inmate to the ground and handcuffed him. *Id.* One of the three reports states that the inmate resisted and an officer responded by spraying the inmate. *Id.* The type of spray used is not specified in any of the reports. The fourth report states that several items were taken out of dorm 4G4 during the raid. *Id.* at 8.

Two other reports detail a fight involving multiple inmates in dorm 3G1 that occurred on July 25, 2006 at 12:45 P.M. *Id.* at 4-5. A third report states that items were removed from the dorm during a raid that occurred at 3:00 P.M. on the same day. *Id.* at 7.

Another report details a raid in dorm 3-4 that occurred on July 26, 2006 at approximately 8:40 P.M. *Id.* at 6. Finally, the last report details an incident involving a fight at the SDU 1 location on July 25, 2006 at 11:47 A.M. The officer who completed this report also detailed that, while responding to the incident at SDU 1, three other inmates were assaulting another inmate at the SDU 5 location. *Id.* at 9.

Defendants provided one page of the transcript from the deposition of Plaintiff taken on December 6, 2007. Defs.' Br. Summ. J. Ex. B. Upon request from the Court, Defendants provided the entire transcript. According to the transcript, the events of July 25, 2006 transpired as follows.

Between 9:30 and 10:30 A.M., Plaintiff was sitting at a table playing cards in the 4G1 dorm of the Passaic County Jail. Pl.'s Dep. 61:16-19, 62:7-9, Dec. 6, 2007. When Plaintiff saw the officers about to enter, Plaintiff moved on to his bunk bed with his face down in his pillow and his hands behind his head. *Id.* at 67:1-68:6. Plaintiff's bunk was the first bunk closest to the gate that led in and out of the dorm. *Id.* at 64:20-21. Plaintiff's bunk is positioned against the

wall to the right of the gate that led in and out of the dorm.  *Id.* at 71:15-18.  Plaintiff's bed was on the bottom of the bunk, about five inches from the floor.  *Id.* at 72:11-13.  The bed above Plaintiff's was approximately three feet above him.  *Id.* at 66:1-3.  The next bunk in the dorm was approximately two or three feet from the foot of Plaintiff's bunk.  *Id.* at 65:20-24.

Although Plaintiff had his face in the pillow, he could see the officers entering the dorm through the corner of his left eye.  *Id.* at 68:19-23, 70:1-2.  The officers marched into the dorm in a single file row.  *Id.* at 87:12-14.  Approximately fifteen officers entered the dorm in this manner.  *Id.* at 84:5.  The officers ordered the inmates to "[g]et on the floor" and lay "[f]ace down with your hands above your head" and warned the inmates that "[i]f you move, I will shoot you."  *Id.* at 62:17-20, 74:25-75:1.  The second or third officer to enter the dorm fired a "mace ball" at Plaintiff, which is the same size as a paint ball and is fired out of paint ball guns.  *Id.* at 70:14-15, 63:1-3.  The mace ball exploded upon impact.  *Id.* at 63:7-9.

Speziale and Bendl are in charge of the officers of the Passaic County Jail and provide orders to the officers.  *Id.* at 58:13-16.  On July 25, 2006, either Speziale or Bendl or both gave the officers involved in the raid of 4G1 orders to use excessive force on the inmates.  *Id.* at 59:3-6.  Both Speziale and Bendl were present when the raid occurred.  *Id.* at 59:25-60:1.  One of the officers who entered Plaintiff's dorm was Speziale.  *Id.* at 84:7-11.  Although each officer, including Speziale, was wearing a gas mask upon entering Plaintiff's dorm, Speziale was the only officer wearing a white shirt.  *Id.* at 84:7-85:3.  The S.O.R.T. members were wearing all-black outfits, and "regular officers" were wearing navy blue outfits.  *Id.* at 89:23-90:1.

When Plaintiff was taken from his dorm to the hallway, he recognized Speziale because Speziale was no longer donning a gas mask, but was wearing the same white shirt.  *Id.* at 85:2-3, 86:1-87:25, 88:1-90:7.  Plaintiff was unable to identify any of the other officers who marched

6

into his dorm because each officer wore a gas mask.  *Id.* at 73:16.  However, once Plaintiff was taken out of the dorm, he was able to identify all of the officers' faces because "they were starting to come out of their gas masks."  *Id.* at 116:12-14.  Three inmates claim they heard or witnessed the officers entering the dorm and Plaintiff being shot.  *Id.* at 99:22-106:25.  If given a trial, Plaintiff intends to call these three inmates as witnesses.  *Id.* at 101:20-22, 103:23-25.

The officers continued to march past Plaintiff to the back of the dorm and apprehended two other inmates.  *Id.* at 75:8-11.  Plaintiff heard the yelling and screaming of the two inmates who were apprehended and, out of the corner of his eye, saw the officers forcibly removing the two inmates from the dorm.  *Id.* at 75:24-25, 76-18-20.  As the officers were exiting the dorm, they noticed Plaintiff was bleeding and decided to handcuff and remove Plaintiff from the dorm as well.  *Id.* at 79:8-17.  Plaintiff was taken to the hallway, where he saw the two inmates who were forcibly removed on their knees up against the wall.  *Id.* at 77:13-78:2.

Plaintiff was led down the hallway to the door of the weight room.  *Id.* at 80:18-19.  A sergeant approached Plaintiff and said to Plaintiff "[o]h, you think you're a tough guy?"  *Id.* at 80:22-24.  Plaintiff could not identify the sergeant by name.  *Id.* at 81:1.  Plaintiff attempted to turn around, face the sergeant, and respond by telling the sergeant that he was not a target of the raid and was only removed from the dorm because he was bleeding.  *Id.* at 81:7-10.  While Plaintiff was in the process of turning around, the sergeant grabbed the back of Plaintiff's head and slammed his face into the wall and told Plaintiff not to look at him.  *Id.* at 81:7-14.

The sergeant then commanded that Plaintiff get on his knees.  *Id.* at 82:6.  While in the process of getting to his knees, Plaintiff moved his right foot one step backward.  *Id.* at 82:7-8.  The sergeant kicked Plaintiff's legs out from under him.  *Id.* at 82:9-10.  Another officer placed his knee on Plaintiff's back for approximately two to four minutes.  *Id.* at 82:11-15.

Plaintiff was then led to the "bull pen" on the first floor and placed there with three or four other inmates for approximately six to seven hours. *Id.* at 90:18-25. Sergeant Abate then entered the bull pen and asked that each of the inmates "plead guilty" to refusing an order and disobeying an officer. *Id.* at 92:1-93:25. Apparently, the inmates were to plead guilty by giving a statement to Sergeant Abate admitting they refused an order and disobeyed an officer. *Id.* at 92:11-15. Sergeant Abate informed inmates that if they pled guilty, they would be sent back to their dorms. *Id.* at 92:8-9. Plaintiff gave a statement to Sergeant Abate denying both that he refused an order and disobeyed an officer, then signed the statement, and was sent back to his dorm anyway. *Id.* at 93:12-95:25. After approximately thirty to forty-five minutes, Plaintiff was taken back to his dorm. *Id.* at 96:3-10. On July 26, 2006, the following day, Plaintiff received medical attention for his injuries. *Id.* at 98:25-99:25.

On July 27, Plaintiff also had a court date at the Passaic County Jail before Superior Court Judge Ralph DeLuccia, Jr.. *Id.* at 54:11-17. Judge DeLuccia instructed Steve Kaplan of the Passaic County Public Defender's Office to inform Plaintiff about his legal options. *Id.* at 54:19-25. Mr. Kaplan suggested that Plaintiff file several things: a grievance with the Passaic County Jail; a criminal report with a municipal court; and a civil suit against Defendants. *Id.* at 54:22-55:16. Plaintiff filed a complaint with the ombudsman of the Passaic County Jail on July 27, 2006 against Defendants. *Id.* at 23:-13-15, 24:12-17, 25:13, 26:23-25. Plaintiff did not immediately receive any response from the ombudsman. *Id.* at 26:2-3. Apparently, Plaintiff did not file a criminal report with a municipal court. On September 1, 2006, Plaintiff did file a civil suit against Defendants in the District Court of New Jersey. *Id.* at 41:4-14.

Around April of 2007, nine months after filing the complaint with the ombudsman, Plaintiff approached an Internal Affairs officer to inquire about the status of his complaint. *Id.* at

26:9-22.  Plaintiff inquired with the Internal Affairs officer because Plaintiff was told by officials at the Passaic County Jail that he would be allowed to see Internal Affairs regarding his complaint.  *Id.* at 26:20-22.  Plaintiff was also told that Internal Affairs would show Plaintiff pictures of all the Passaic County Jail officers who conducted the search and raid in the 4G1 dorm on July 25, 2006 so that Plaintiff could identify which officers committed the alleged constitutional violations.  *Id.* at 26:23-27:1.  Internal Affairs never allowed Plaintiff such an opportunity.  *Id.* at 27:1.

Approximately two or three weeks after Plaintiff approached the Internal Affairs officer, the same officer informed Plaintiff that the officer's investigation revealed that the actions of Defendants were justified.  *Id.* at 27-6:8.  Plaintiff intended to file the complaint with a municipal court in Passaic County, but decided against doing so after the Internal Affairs officer informed Plaintiff that the investigation concluded that the Defendants' action were justified.  *Id.* at 37:10-12.

Plaintiff also filed three grievance forms with the ombudsman.  *Id.* at 28:6-7.  Plaintiff's first grievance form was attached to the complaint that was filed with the ombudsman on July 27, 2006.  *Id.* at 29:6-7.  On July 31, 2006, several investigators from the Passaic County Public Defender's Office visited Plaintiff.  *Id.* at 38:4-39:20.  These investigators took a report from Plaintiff and took pictures of Plaintiff's face, back and shins.  *Id.* at 38:7-9, 38:24-39:2.  After that day, Steve Kaplan of the Public Defender's Office informed Plaintiff that no action was being taken on behalf of Plaintiff because Plaintiff had already filed complaints with the Passaic County Jail.  *Id.* at 39:17-20.

Plaintiff's stated injuries from the alleged July 25, 2006 raid are as follows: his face was "bruised and scratched open" *id.* at 41:21-22; his face was swollen, *id.* at 41:25; both of his shins

were "scraped" *id.* at 41:25-42:1; and he had "a hole in [his] back the size of a paint ball" *id.* at 42:10-11.  As of the date of the deposition, Plaintiff "still ha[s] the lower back pain from being beaten on and shot with."  *Id.* at 48:17-18.

Plaintiff's second grievance form was given to Sergeant Romeo in August of 2006.  *Id.* at 29:1-25.  Plaintiff approached Sergeant Romeo as to the status of the second grievance form in September of 2006, and Sergeant Romeo suggested that Plaintiff file a third grievance form.  *Id.* at 31:1-10.  That same day, Plaintiff filed a third grievance form.  *Id.* at 31:11-17.  Two weeks later, in the middle of September of 2006, Plaintiff approached Sergeant Romeo about the status of his grievance forms.  *Id.* at 32:2-7.  Sergeant Romeo informed Plaintiff that the grievance process is slow.  *Id.* at 32:9-10.

From September of 2006 through March of 2007, Plaintiff filed grievance forms with the ombudsman at least twice a month.  *Id.* at 34:6-11.  The ombudsman informed Plaintiff that the Passaic County Jail was taking no action regarding Plaintiff's grievance forms.  *Id.* at 35:15-21. Plaintiff was transferred out of the Passaic County Jail in August of 2007.  *Id.* at 23:3-4.

The Court requested that Defendants provide a copy of the Passaic County Jail policy. Defendants provided the Passaic County Jail Inmate Handbook as well as section 8.3 of the Passaic County Sheriff's Department handbook.

## III.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt about the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 318 (1986). Once the moving party meets its initial burden, the burden then shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The need of the non-movant to conduct further discovery does not preclude summary judgment unless the non-movant demonstrates how the additional discovery would preclude summary judgment. *Dowling v. City of Philadelphia*, 855 F.2d 136, 139-40 (3d Cir. 1988).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crafting Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Anderson*, 477 U.S. at 255).

**IV.     Discussion**

**A.     Plaintiff's Excessive Use of Force Claim Under the Fourteenth Amendment Due Process Clause**

Pursuant to 28 U.S.C. § 1915, this Court dismissed Plaintiff's claim that Defendants unconstitutionally confiscated his property.  *Athill v. Speziale.*, No. 06-04941(SDW), at 12-16 (D.N.J. Oct. 31, 2006) (Order granting *in forma pauperis* application and dismissing Plaintiff's loss of property claim).  However, this Court allowed Plaintiff's excessive force claim to proceed under 42 U.S.C. § 1983, holding that the claim could be construed as an excessive force claim in violation of either Plaintiff's Eighth Amendment or Fourteenth Amendment rights.  *Id.* at 6.  This Court did not determine which amendment the excessive force claim violated because the pleadings did not make clear whether, at the time of the alleged incident, Plaintiff had been sentenced.  *Id.* at 6.  Accordingly, this Court now turns to whether Plaintiff's excessive force claim under 42 U.S.C. § 1983 is brought under the Eighth or Fourteenth Amendment.

The Eighth Amendment reads "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. amend. VIII.  "It cannot be doubted that excessive or unprovoked violence and brutality inflicted by prison guards upon inmates violates the Eighth Amendment."  *U.S. v. Bailey*, 444 U.S. 394, 423 (1980).  However, "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."  *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977).  "Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."  *Id.*  The Due Process Clause of the Fourteenth Amendment states that "[no] State [shall] deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. CONST. amend. XIV.

The Court of Appeals for the Third Circuit has held that a convicted inmate who is awaiting sentencing has the same status under the U.S. Constitution as that of a pretrial detainee. *Fuentes v. Wagner*, 206 F.3d 335, 341 (3d Cir. 2000).  The rights of a pretrial detainee under the Fourteenth Amendment Due Process Clause are at least as great as the Eighth Amendment protections available to a convicted prisoner.  *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  The Supreme Court has explicitly declined to decide if excessive use of force claims brought under the Fourteenth Amendment Due Process Clause should be analyzed any differently than excessive force claims brought under the Eighth Amendment.  *Whitley v. Albers*, 475 U.S. 312, 327 (1986) ("Because this case involves prison inmates rather than pretrial detainees or persons enjoying unrestricted liberty we imply nothing as to the proper answer to that question outside the prison security context by holding, as we do, that in these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause.").  The Third Circuit has ruled that § 1983 excessive use of force claims brought by pretrial detainees under the Fourteenth Amendment Due Process Clause should be analyzed under the same standard as excessive use of force claims brought under the Eighth Amendment.  *Fuentes*, 206 F.3d at 346-47.  Other Circuit Courts have agreed.  *See Henderson v. Sheahan*, 196 F.3d 839, 845 n.2 (7th Cir. 1999) ("Whether [the plaintiff's] present injury claim is analyzed under the Eighth or Fourteenth Amendment ultimately makes no practical difference to our resolution of his challenge on appeal because we have already held that § 1983 claims brought under the Fourteenth Amendment are to be analyzed under the Eighth Amendment test."); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) ("Claims by pretrial detainees are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eighth Amendment. . . .  Because pretrial detainees' rights under the Fourteenth Amendment are

comparable to prisoners' rights under the Eighth Amendment, however, we apply the same standards."); *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) ("Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment . . . In determining whether appellant's rights were violated, however, we apply an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners . . . However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees.").

In this case, the date of Plaintiff's conviction is unknown, but Plaintiff's sentence date was verified via telephone communication with a representative of the Passaic County Prosecutor's Office on June 29, 2009. According to said representative, Plaintiff's sentence date was August 3, 2007. The alleged excessive use of force took place on July 25, 2006. Compl. 6. Thus, Plaintiff's constitutional status at the time of the alleged constitutional violation was that of a pretrial detainee. As such, Plaintiff's excessive use of force claim must be analyzed under the Fourteenth Amendment Due Process Clause. Defendants' contention that the excessive use of force claim should be analyzed under the Fourth Amendment is without merit.

### B.   Whether Defendants Have Qualified Immunity from Plaintiff's Excessive Use of Force Claims

This Court must address whether the doctrine of qualified immunity protects Defendants against suit. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity is "an immunity from suit rather than a mere defense to liability."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted).

The Supreme Court has recently altered its qualified immunity jurisprudence.  In *Saucier v. Katz*, 533 U.S. 194  (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims.  First, a court must decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right.  *Saucier*, 533 U.S. at 201.  Second, if the plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  *Id*.  At step two, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 202.

Earlier this year, the Supreme Court held that the sequence of the two-pronged *Saucier* analysis "should not be regarded as mandatory in all cases" and that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the [*Saucier*] qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

Although the sequence of the two-pronged *Saucier* analysis is no longer mandatory, this Court will nonetheless initially address the traditional first prong: whether the facts alleged make out a violation of Plaintiff's Fourteenth Amendment Due Process Clause right to be free from excessive use of force as a pretrial detainee.  If this Court finds that the facts establish a violation of this right, then the second *Saucier* prong, whether it was clear to Defendants that the right was clearly established, does not need to be reached because "[m]alicious and sadistic use of force is

*always* in violation of clearly established law." *Thomas v. Ferguson*, 361 F. Supp. 2d 435, 442

n.7 (D.N.J. 2004) (citing *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002)); *see also*

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (stating that, in a case in which

the juvenile prisoner plaintiffs alleged that the defendants used excessive force in violation of the

Eighth Amendment, "to the extent that the plaintiffs have made a showing sufficient to overcome

summary judgment on the merits, they have also made a showing sufficient to overcome any

claim to qualified immunity.").

In this case, three discrete uses of force and, thus, three possible violations of Plaintiff's

Fourteenth Amendment Due Process Clause rights, occurred: (1) the shooting of Plaintiff in the

back with a mace gun by a S.O.R.T. Officer, Compl. 6; Pl.'s Dep. 65:5-6; (2) the Unknown

Sergeant's slamming of Plaintiff's head into the wall and the kicking of Plaintiff's legs, Compl.

6; Pl.'s Dep. 81:1-82:10; and (3) the placement of a S.O.R.T. Officer's knee on Plaintiff's back

for several minutes, Compl. 6; Pl.'s Dep. 82:11-12.  We now turn to the question of whether a

reasonable jury could find that each of these discrete uses of force were excessive.

In an excessive use of force claim under the Eighth Amendment, the central question is

"whether the force was applied in a good-faith effort to maintain or restore discipline, or

maliciously and sadistically to cause harm." *Brooks*, 204 F.3d at 106 (quoting *Hudson v.

McMillian*, 503 U.S. 1, 7 (1992)).  As the Third Circuit has held:

> [i]n determining whether a correctional officer has used excessive
> force in violation of the Eighth Amendment, courts look to
> several specific factors including: (1) the need for the application
> of force; (2) the relationship between the need and the amount of
> force that was used; (3) the extent of injury inflicted; (4) the
> extent of the threat to the safety of staff and inmates, as
> reasonably perceived by responsible officials on the basis of the
> facts known to them; and (5) any efforts made to temper the
> severity of a forceful response.

*Brooks*, 204 F.3d at 106 (quoting *Whitley*, 475 U.S. at 321 (internal quotations omitted)).

### 1.   The Mace Gun Shooting

Applying the *Brooks* factors leads us to conclude that there is a genuine issue of material fact as to whether the S.O.R.T. Officer was justified in shooting Plaintiff with a mace gun.  A reasonable jury could find that such force was unconstitutionally excessive.  According to Plaintiff, when Defendants entered Plaintiff's dorm and the S.O.R.T. Officer shot him with a mace gun, Plaintiff was sitting on a bench playing cards.  He then moved to his bunk and complied with Defendants' commands to lay face down with his fingers intertwined behind his head.  Compl. 6.  There is no evidence that contradicts Plaintiff's version of events.

Defendants contend to no avail that they are immune from suit under the doctrine of qualified immunity.  Defendants ground their qualified immunity argument on the assertion that tensions were running high in the Passaic County Jail on the date of the alleged constitutional violation.  They contend that on that date, "officers were being required to enter into these dorm rooms with the possible danger of having a number of inmates confront them" because it was "a volatile time and one which called for extreme caution to be used."  Defs.' Br. Summ. J. 8. However, Defendants have not submitted any incident reports from the raid that occurred in Plaintiff's dorm, affidavits from prison guards or testimony, which could substantiate the need to use a mace gun on Plaintiff.  Again, there is no evidence to contradict Plaintiff's assertion that he was peacefully following orders at the time he was shot.  *Cf. Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002) (finding use of pepper spray on inmates inside a cell was not excessive under the Eighth Amendment because the inmates who were sprayed were fighting at the time the pepper spray was used); *Baldwin v. Stalder*, 137 F.3d 836 (5th Cir. 1998) (finding use of pepper spray on inmates traveling on a bus was not excessive under the Eighth Amendment because inmates

who were sprayed were jumping on the seats, spitting at the officers outside the bus and rocking the bus at the time the pepper spray was used).  Furthermore, Defendants have failed to provide any evidence demonstrating that the inmates in Plaintiff's dorm posed a threat to anyone's safety, thus there appears to be no justification for using force on Plaintiff.  *Treats v. Morgan,* 308 F.3d 868 (8th Cir. 2002) (finding genuine issue of material fact as to whether inmate plaintiff's Eighth Amendment rights were violated when corrections officer defendant used pepper spray on plaintiff even though plaintiff "had not jeopardized any person's safety or threatened prison security"); *see also Brewer v. Jones*, 2003 U.S. Dist. LEXIS 16100 (S.D.N.Y. Sept. 12, 2003).  As such, a reasonable jury could conclude that the Defendants' use of a mace gun on Plaintiff was used "maliciously and sadistically to cause harm" rather than as "a good-faith effort to maintain or restore discipline."  *Brooks,* 204 F.3d at 106.  Accordingly, the second *Saucier* prong is satisfied because "[m]alicious and sadistic use of force is *always* in violation of clearly established law."  *Thomas*, 361 F. Supp. 2d at 442 n.7.

### 2.    Slamming Plaintiff's Head and Kicking Plaintiff's Legs

Applying the *Brooks* factors also leads us to conclude that there are genuine issues of material fact as to whether the Unknown Sergeant was justified in slamming Plaintiff's head into the wall and kicking Plaintiff's legs out from under him.  A reasonable jury could find that such force was unconstitutionally excessive.  Plaintiff alleges that while handcuffed, he turned around to answer a question posed by the Unknown Sergeant, who then slammed Plaintiff's head into a wall.  Compl. 6.  Plaintiff further alleges that he was attempting to comply with the Unknown Sergeant's order to get on his knees when the Unknown Sergeant kicked Plaintiff's legs out from under him.  Compl. 6; Pl.'s Dep. 81:7-14.  Defendants have failed to proffer any evidence contradicting Plaintiff's allegations.

Instead, Defendants argue to no avail that when Plaintiff turned to answer the Unknown Sergeant, "[t]his in and of itself may be a violation of the Jail policy which indicates that inmates must face the wall with their hands against it.  Giving Plaintiff every reasonable inference, any deviation from the protocol may be seen under the circumstances as a potentially dangerous situation."  Defs.' Br. Summ. J. 8-9.  However, the portion of the Passaic County Jail Inmate Handbook provided to the Court, and section 8.3 of the Passaic County Sheriff's Department regulations, which was also provided to the Court, do not contain any rule regarding the direction that inmates must face during questioning.  In a letter to this Court, Defendants state, "[a]lthough specifically [these submissions do] not indicate the language that inmates' hands must be against the wall, this is the customary position whenever an inmate is pat-searched during any routine movement."  Defs.' Letter Apr. 15, 2009.  Defendants do not submit any proof to support their contention.

It is well-established that "bare assertions" will not be considered for purposes of summary judgment.  *Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 325).  Defendants have not established that facing a wall during questioning is, in fact, Passaic County Jail policy.  For these reasons, Defendants have failed to contradict Plaintiff's allegations that he simply turned around to answer a question when the Unknown Sergeant slammed his head into the wall and kicked Plaintiff's legs out from under him for no good reason.  Accordingly, a reasonable jury could conclude that such force was used "maliciously and sadistically to cause harm" rather than as "a good-faith effort to maintain or restore discipline."  *Brooks,* 204 F.3d at 106.  As such, the second *Saucier* prong is satisfied because "[m]alicious and sadistic use of force is *always* in violation of clearly established law." *Thomas*, 361 F. Supp. 2d at 442 n.7.

### 3.      The Placement of S.O.R.T. Officer's Knee in Plaintiff's Back

Applying the *Brooks* factors leads us to conclude that there is a genuine issue of material fact as to whether the S.O.R.T. Officer was justified in placing his knee on Plaintiff's back for about five minutes while Plaintiff was handcuffed, shortly after Plaintiff's legs had been kicked out from under him.   Compl. 6.   A reasonable jury could find that such force was unconstitutionally excessive.   Defendants offer no evidence to contradict Plaintiff's allegation that this force was used for no good reason.   As such, a reasonable jury could find that the placement of the S.O.R.T. Officer's knee on Plaintiff's back was done "maliciously and sadistically to cause harm" rather than as "a good-faith effort to maintain or restore discipline." *Brooks,* 204 F.3d at 106.   Accordingly, the second *Saucier* prong is satisfied because "[m]alicious and sadistic use of force is *always* in violation of clearly established law." *Thomas*, 361 F. Supp. 2d at 442 n.7.

### C.      Speziale and Bendl's Supervisory Liability

This Court must address whether Speziale and Bendl had personal involvement in the alleged excessive use of force against Plaintiff.   "A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . [which] can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995) (analyzing a § 1983 claim against a police officer who supervised a raid by discussing whether the actions of the supervising police officer met the standard of "supervisory liability, that is 'actual knowledge or acquiescence'") (citing *Rode*, 845 F.2d at 1207); *Reed v. Straniero*, 2007 U.S. Dist. LEXIS 84101, *8  (D.N.J. Nov. 13, 2007) ("Personal involvement by a defendant is an indispensable element of a valid legal claim [under § 1983]; such personal involvement may

exist only where the named defendant violated the plaintiff's rights . . . by directing others to violate the plaintiff's rights (or by tolerating past or ongoing misbehavior of subordinates while having both supervisory power and knowledge of these constitutional violations."); *Arnold v. New Jersey*, 2007 U.S. Dist. LEXIS 33982, *12 (D.N.J. May 9, 2007) ("A supervisory official acting under color of state law 'may only be sued in his individual capacity under . . . [§] 1983 where the individual defendant is 'personally involved in the alleged wrongs.' Personal involvement can be shown through 'allegations of personal direction or of actual knowledge and acquiescence.'") (internal citations omitted); *Santiago v. City of Vineland*, 107 F. Supp. 2d 512, 540 (D.N.J. 2000) ("It is well-established that an individual defendant can be liable in his or her individual capacity under section 1983 if the individual is personally involved in the alleged wrongs.") (citations omitted).

*Baker* is apposite to this issue.  In *Baker*, the Third Circuit reviewed a District Court's grant of summary judgment in favor of the defendants in a § 1983 case.  Members of a family were approaching the home of another family member who had invited them to dinner. Simultaneously, the Drug Enforcement Agency and the Gloucester County Prosecutor's Office were launching a drug raid on the same home.  As the family members walked up to the door, they were startled by officers running past them with guns in their hands, shouting "get down." Some of the officers, including the supervising officer, ran directly into the home, but others forced the family members to the ground.  The family members testified that the officers pointed guns at them, handcuffed them, left some of them handcuffed for as much as twenty-five minutes, searched a male family member and emptied a female family member's pocketbook onto the ground outside the home.  After the family members identified themselves as relatives, the police released them.

The Third Circuit addressed whether the supervising officer could be found liable for the alleged Fourth Amendment violations committed by his subordinates.  The Court concluded that the supervising officer could be found liable for the use of guns and handcuffs and the search of the male family member, but not for the emptying of the female family member's purse.  The Court stated:

> [a]lthough [the supervising officer] did not personally use excessive force or order its use, we conclude that there is sufficient evidence to permit an inference that [the supervising officer] knew of and acquiesced in the treatment [the family members] were receiving at the hands of the other officers acting under his supervision.  [The family members] said they were handcuffed while outside.   [The supervising officer] said he "hollered" out the door of the apartment "to bring those people in."  [A female family member] testified that they were brought into the kitchen and her testimony is sufficient to support a finding that the [female family members] sat in the kitchen for about ten minutes in handcuffs.  [A female family member] said a gun was pointed at her head.  [A male family member] was taken to a bedroom in handcuffs and was searched.  He testified that he remained handcuffed after he had returned to the kitchen and for some five minutes more until he was told it was all right to leave. [Another female family member] also testified that [the male family member] had his handcuffs on until [the family] w[as] released and told to go outside.   It was a small apartment [containing only three rooms and a bath].   [The supervising officer] stated that there was an open doorway from the room in which he was speaking to [the drug raid suspect] to the kitchen or dining room where [the family] w[as].  These few facts, taken together, are sufficient to allow a factfinder to infer that [the supervising officer] was aware of how the [family] w[as] being treated, but permitted that treatment to continue for some amount of time before he stopped it.

> [. . .]

> [The male family member] testified that police took him through the kitchen and the living room to the first bedroom, where they searched him for five to ten minutes.  Police went through his wallet, made him take off his shoes and shirt, and checked his socks.  [The supervising officer's] mere presence in this small apartment where [the male family member] was undergoing this

> protracted search was sufficient to permit an inference that he was
> aware of the evidentiary search.

*Baker*, 50 F.3d 1186 at 1193-95.  The Court seemed to focus on two factors: the proximity of the supervising officer to the location of the unconstitutional conduct and the duration of time the supervising officer was aware that the family was being subjected to unconstitutional conduct.

Applying the analysis in *Baker*, we find that there are genuine issues as to the supervisory liability of Speziale with regard to the knee in Plaintiff's back.  As for the proximity factor, a reasonable fact-finder could infer that Speziale had a direct line of sight to Plaintiff when the S.O.R.T. Officer had his knee on his back.   According to the Complaint and Plaintiff's deposition testimony, Speziale was present during the raid, Pl.'s Dep. 59:25, 60:1, and Plaintiff identified Speziale when he removed his gas mask, Pl.'s Dep. 84:23-85:3.  Specifically, Speziale was present in the hallway when Plaintiff was removed from his dorm and taken down the hallway for questioning by the Unknown Sergeant.  *Id.* at 89:5-10, 80:18-19.  While the distance between Speziale and Plaintiff is unknown, and Plaintiff states that he was "all the way on the other end of the hallway [from the dorm]" when he was questioned by the Unknown Sergeant, *id.* at 81:23-24, a reasonable fact-finder could infer that Speziale was close enough to be aware of the force used on Plaintiff.  Defendants provide no evidence to contradict Plaintiff's allegation that Speziale was present in the hallway when his subordinate, a S.O.R.T. Officer, had his knee on Plaintiff's back.

As for the duration factor, a reasonable fact-finder could infer that, for up to five minutes, the S.O.R.T. Officer had his knee on Plaintiff's back.  *Id.* at 82:14-15; Compl. 6.  Defendants provide no evidence to contradict Plaintiff's allegation that the use of force continued for up to five minutes.  For these reasons, a reasonable fact-finder could infer that Speziale was aware of the use of force lasting for up to five minutes and did nothing to stop it.  As such, there are

genuine issues as to material facts regarding Speziale's supervisory liability for the S.O.R.T. Officer's knee on Plaintiff's back. *See Baker*, 50 F.3d at 1195 (holding that "mere presence" of the supervising officer "in th[e] small apartment" was sufficient to establish supervisory liability over the unconstitutional search of the family member that lasted five to ten minutes in one of the rooms of the apartment).[2]

Applying the analysis in *Baker*, we find that there is insufficient evidence to infer that Speziale had actual knowledge or acquiesced in the shooting of Plaintiff by a S.O.R.T. Officer. The finding of supervisory liability in *Baker* was ostensibly premised upon the idea that the supervising officer had adequate time to observe the violation and order its discontinuance, yet refused to do so. While Speziale had several minutes to observe and stop the S.O.R.T. Officer from putting his knee on Plaintiff's back, which occurred at the end of the hallway, Speziale did not have enough time to prevent the S.O.R.T. Officer from pulling the trigger of his mace gun, nor did he have enough time to prevent Plaintiff's head from being slammed and legs kicked. Because of the instantaneous nature of these uses of force, he could not have stopped them once they were put into motion. Further, even Plaintiff does not assert that Speziale ordered such force. Pl.'s Dep. 60:24-25. Thus, there are no genuine issues of material fact regarding Speziale's supervisory liability in relation to the mace gun shooting or the slamming of Plaintiff's head and kicking of his legs.

Applying the analysis in *Baker*, we find that there is insufficient evidence to infer that Bendl had supervisory liability for any force used against Plaintiff. Plaintiff merely alleges that

---

[2] This Court is mindful of then-Judge Alito's dissent in *Baker*, which criticized the majority for arguably ignoring the "actual knowledge" element of supervisory liability. Then-Judge Alito stated that, to find supervisory liability, the supervising officer would not only have to acquiesce to an illegal search, but would also have to know that the officers conducting the search "lacked a lawful basis for the search." *Baker*, 50 F.3d at 1201. In this case, the actual knowledge requirement is satisfied because a reasonable jury could find that Speziale had a direct line of sight to the Plaintiff and the S.O.R.T. Officer. If Speziale could observe them, he would have actual knowledge that Plaintiff was not a safety threat and, thus, the S.O.R.T. Officer's use of force "lacked a lawful basis." *Id.*

Bendl was present during the raid.  Pl.'s Dep. 59:25, 60:1.  However, Plaintiff does not specify where Bendl was during the raid, nor does Plaintiff explain how he identified Bendl during the raid.  Bendl's mere presence during the raid is insufficient to permit an inference that Bendl was personally involved with any of the force used against Plaintiff.

### D.       Plaintiff's Inability to Identify Certain Defendants

This Court must address whether Plaintiff's inability to identify certain Defendants forecloses his claims against them.  Incarcerated civil rights *pro se* plaintiffs often face "informational disadvantages" in conducting pre-trial investigations usually necessary for including sufficient factual specificity in a complaint.  *Alston v. Parker*, 363 F.3d 229, 233 n.6 (3d Cir. 2004).  These disadvantages can make it difficult for such plaintiffs to identify defendants in their complaints.  *Id.*  However, failure to identify certain defendants in a complaint does not mandate immediate dismissal.  *Hines v. FDIC*, 137 F.3d 148, 155 (3d. Cir. 1998) (noting that the Third Circuit allows stand-ins such as Doe defendants).  Plaintiffs should thus be allowed every opportunity to identify the unknown defendants.  *Alston*, 363 F.3d at 233 n.6 (citing *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) and *Billman v. Indiana Dep't of Corr.*, 56 F.3d 785, 789-90 (7th Cir. 1995)).  However, when such opportunity would clearly be unavailing, the court should dismiss the complaint as to the unidentifiable party.  *Gillespie*, 629 F.2d at 642 ("[T]he plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities . . . .").

In this case, the claim against the S.O.R..T. Officer must be dismissed because it would be impossible for Plaintiff to identify such Officer.  The S.O.R.T. Officer was masked at the time of the mace gun shooting.  Pl.'s Dep. 73:16.  Plaintiff did not see the S.O.R.T. Officer without his mask, and Plaintiff had no way of distinguishing the Officer who shot him.  Thus, even if

given the opportunity to search through a roster, Plaintiff could not identify the S.O.R.T. Officer who shot him with a mace gun.

On the other hand, the claims against the Unknown Sergeant, who slammed Plaintiff's head and kicked his legs, and the unknown S.O.R.T. Officer, who kneed Plaintiff's back, should not be dismissed at this time because Plaintiff may be able to identify them.  In April 2007, about nine months after the alleged incident, Plaintiff was told by an Internal Affairs officer that "Internal Affairs would show [him] pictures of everybody who conducted the search and the raid in the dorm that day, so [he'd] be able to point out exactly who did what."  *Id.* at 26:20-27:1. According to Plaintiff, "[t]his never happened."  *Id.* at 27:1.  Assuming he does have the opportunity to examine pictures of the officers who conducted the raid, Plaintiff may be able to identify the Unknown Sergeant and unknown S.O.R.T. Officer because they did not have masks on and he may have seen their faces.

### E.      Lack of Medical Evidence

In this Circuit, "the absence of proof of minor or significant injury [in excessive use of force claims] should not mandate dismissal."  *Brooks*, 204 F.3d at 108 ("[T]he Supreme Court is committed to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual *force* that results in sufficient *injury*.") (emphasis in original).

Defendants argue to no avail that summary judgment should be granted because Plaintiff has not provided any medical reports to substantiate his allegations that his back pain is related to the July 25, 2006 raid.  Because proof of minor or significant injury is not required, this Court will not grant Defendants' motion for summary judgment based on Plaintiff's failure to submit medical reports linking his back pain to the July 25, 2006 incident.

V.      **Conclusion**

For the foregoing reasons, Plaintiff's § 1983 claim against the S.O.R.T. Officer, who shot Plaintiff with a mace gun, is dismissed with prejudice.  Plaintiff's § 1983 supervisory liability claims against Speziale as to the mace gun shooting and the slamming of Plaintiff's head and kicking of Plaintiff's legs are dismissed with prejudice.  Plaintiff's § 1983 supervisory liability claims against Bendl are dismissed with prejudice.

Further, Plaintiff's § 1983 claims against the Unknown Sergeant for slamming his head and kicking his legs, and the unknown S.O.R.T. Officer for kneeing his back, withstand summary judgment and are not dismissed.  Plaintiff's § 1983 claim against Speziale as to the kneeing of Plaintiff's back withstands summary judgment and is not dismissed.

An Order follows.


                              **S/SUSAN D. WIGENTON, U.S.D.J.**

cc:  Madeline Cox Arleo, U.S.M.J.


27